## Case No. 15,071.

### UNITED STATES v. FARNHAM.

[2 Blatchf. 528; 11 N. Y. Leg. Obs. 161; 10 West. Law J. 289.] [1]

Circuit Court, S. D. New York. Jan. 21, 1853.

SHIPPING — PUBLIC REGULATIONS — SAFTY VALVE OF STEAMBOAT—NEGLECT TO RAISE—INDICTMENT FOR MANSLAUGHTER.

1. On an indictment for manslaughter, under the twelfth section of the act of July 7, 1838 (5 Stat. 306), against the captain of a steamboat, it is not necessary for the prosecution to show wilful misconduct, negligence or inattention in the captain.

2. The captain of a steamboat is responsible for the proper performance by the engineer the pilot and all the other officers, of their duties on board, unless their authority is expressly made independent of him.

3. The duties and responsibilities of the captain of a steamboat are the same as those of the captain of any other vessel; and, as to the relative duties and responsibilities of the different officers of steam vessels, there is no distinction between those which navigate inland waters exclusively and sea-going vessels.

4. The seventh section of the act above named makes it the duty of the master to see that the safety-valve of the boiler is raised when the steamboat stops.

5. Under that section, it is not sufficient to raise the safety-valve only when the pressure of steam is higher after than before the stoppage of the boat.

6. Nor is the safety-valve to be raised only when the pressure of steam becomes, during the stoppage, higher than that named in the certificate of the inspectors as the pressure the boiler will bear.

7. Nor can other methods of lowering the pressure of steam—such as opening the furnace-doors—be substituted for the raising of the safety-valve.

8. It is a culpable omission in the captain to leave it to the discretion of the engineer whether to raise the safety-valve during a stoppage or not.

9. The omission of the captain to give orders for the raising of the safety-valve when the boat stops, is legal evidence to support an indictment against him under the twelfth section of the act, provided the omission to raise the safety-valve was the proximate cause of the destruction of life.

This was an indictment against the defendant [Charles W. Farnham], under the twelfth section of the act of July 7, 1838, entitled "An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam" (5 Stat. 304), for manslaughter, in causing the death of several persons, who lost their lives by the explosion of the boiler of the steamboat Reindeer, while she was landing passengers at Bristol dock, on the Hudson river. The defendant was the captain of the steamboat. The substance of the indictment, and the facts put in evidence to sustain it, on the trial, which took place before BETTS, District Judge, sufficiently appear from the charge of the court.

J. Prescott Hall, U. S. Dist. Atty.

William Curtis Noyes and Dennis McMahon, for defendant.

[2] [BETTS, District Judge. In this case, gentlemen of the jury, you have heard with great attention the testimony offered for the prosecution and the defence, and the arguments of the public prosecutor and the defendant's counsel; and no doubt you are possessed of every fact essential to the merits of the case, both on the part of the United States and the accused. The indictment was originally framed against two persons, the master and engineer of the steamboat Reindeer; but, at the instance of the parties accused, the charges have been severed, and the proceedings are now carried on against the master alone. Although the character of the event which gives rise to this prosecution, is calculated to excite deep interest in the community, with which you, as citizens, must necessarily sympathize, we may, nevertheless, congratulate ourselves that the case is now presented under such circumstances that the court and yourselves can

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission. 10 West. Law J. 289, contains a condensed report.]

[2] [From 11 N. Y. Leg. Obs. 161.]

give to it a calm, dispassionate, and impartial consideration. It is not disputed but that Capt. Farnham was fully competent to the station in which he was employed. He was an experienced navigator. He had been, more or less, for a long period familiar with the use of steam machinery, and he was skilful and prudent in the discharge of his duties. There is no imputation against him of any improper command or omission, directly relating to this disaster, nor a suggestion that he was guilty of any act intentionally wrong. There was no designed culpability on his part, either of commission or neglect. Furthermore, although the occurrence was startling and deplorable in the extreme, causing the loss of numerous lives, and filling the whole community with alarm, yet happening more than one hundred miles from this city, and five or six months having elapsed since the shock was experienced, there is no reason to apprehend that you entertain unfavorable prepossessions against the defendant, or any other feelings upon the subject than such as are common to the public at large, and are compatible with an unprejudiced judgment upon this case. Nor is there any reason to suppose that you had friends or relatives involved in the calamity, whose sufferings or exposure may appeal to your sympathies to the disadvantage of the accused. The court, therefore, congratulate you that, on coming to the consideration of this case, you can examine the facts, and pass upon the whole transaction, in a calm and dispassionate frame of mind.

[In the first instance, a question of law was raised, in behalf of the defendants, whether this court, acting under the authority of the federal government, could take cognizance of the case. That question was properly addressed to the court, as entirely one of law. The court decided that the laws of the United States govern the subject, and have vested cognizance of it in this tribunal. You will, therefore, not regard that point as before you for consideration, and will proceed upon the issue before you, and dispose of it according to law and evidence, acquitting the accused, if you do not find the charge in the indictment satisfactorily fastened upon him, or condemning him by your verdict if your judgments are convinced that he has committed the offence created and defined by the law. It has been remarked, by counsel, that this court has no jurisdiction in the case other than what is conferred by the act of congress referred to. Such is the law. Unless congress had legislated on the subject, the offence, however heinous, could not be proceeded against here, but would have come under the authority of the state tribunals. Those judicatories might have cognizance of the offence, by force of the common law, without any act of the legislature. But the courts of the United States cannot look to any authority other than the written law, the act of congress, in relation to this subject, which creates the offence under prosecution, and appoints the mode and ex-

tent of its punishment. It may aid us, in passing upon the facts of the case, to take a slight survey of the objects which congress had in view in making these enactments. To this end we may profitably notice the state of navigation by steam in this country when congress passed the act of 1838. You are aware that, as an historical fact, steam had been employed for more than thirty years coastways, and in all the interior waters of the country, and that the use of it was accompanied by many startling disasters, particularly on the Western waters; and the destruction to property and the loss of life so agitated public feeling that congress undertook to enforce regulations in the equipment and navigation of vessels propelled by steam, which might tend to the preservation of life and property exposed to that mode of transportation. The purpose of congress manifestly was to reach the source from which these evils sprung, and establish rules for their prevention. In order to effect this, provisions were enacted requiring vessels propelled, in whole or in part, by steam, to be sufficiently strong to sustain the weight of the machinery used, directing precautions to be supplied against the hazard of fire in generating steam, and to enforce watchful precautions in the management of the machinery, both to avert explosions and disabling the vessel, as also to secure all practicable skill and prudence in navigating it.

[You will observe, from this general summary, the leading design of the act of 1838. To give efficacy to these provisions, the act requires every vessel belonging to citizens of the United States to be enrolled or registered, and that no vessel propelled in whole or in part by steam shall be registered without first complying with the conditions designated; and, to compel an enrolment, declares that no such vessel shall navigate the waters of the United States without it; and imposes a penalty of $500 every time a steam vessel is run without such enrolment. The act points out the particular qualifications necessary to obtain an enrolment, and, in order to ascertain the sufficiency of the vessel and her machinery, it created a board of inspectors for every revenue district of the United States, designating their duties with great minuteness. They are to examine the vessel, and determine whether she possesses sufficient strength and capacity, and also carefully examine the steam boilers, and see that they are sufficiently strong for the purpose they are to be employed in; and, if satisfied that the vessel and boilers are of sufficient strength, in their judgment, they give a certificate of such facts, without which the collector cannot grant an enrolment. In this way congress intended to provide for a rigid examination of vessels and machinery by officers appointed for that purpose, and thus secure a higher degree of confidence and safety in this most important mode of conveyance. The law was not, however, limited to measures looking to the strength and sufficiency of steamboats and their ma-

chinery alone, but it gave to those requirements the most stringent sanctions, pecuniary and personal, against owners and officers, in order to guaranty the safety of persons and property transported in such vessels. The regulations to insure the safety of property or remunerate for its loss, need not be specified at large, but will be hereafter adverted to, as explanatory of the penal enactments. They are contained in sections 7 and 12, which have been read to you.] [2]

The indictment in this case is founded on the twelfth section of the act of July 7, 1838, which is in these words: "And be it further enacted, that every captain, engineer, pilot or other person employed on board of any steamboat or vessel, propelled in whole or in part by steam, by whose misconduct, negligence or inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and, upon conviction thereof, before any circuit court in the United States, shall be sentenced to confinement at hard labor, for a period of not more than ten years." The seventh section of the act is to be taken in connection with the twelfth, as indicating the particular act of negligence on which the indictment is based. That section is as follows: "And be it further enacted, that whenever the master of any boat or vessel, or the person or persons charged with navigating said boat or vessel, which is propelled in whole or in part by steam, shall stop the motion or headway of said boat or vessel, or when said boat or vessel shall be stopped for the purpose of discharging or taking in cargo, fuel or passengers, he or they shall open the safety-valve, so as to keep the steam down in said boiler as near as practicable to what it is when the said boat or vessel is under headway, under the penalty of two hundred dollars for each and every offence."

The indictment charges on the master of the Reindeer the crime of manslaughter, because, by his misconduct, negligence or inattention at the time and place alleged, the lives of many persons on board were destroyed. The question at issue on the indictment is, whether the government has, by legal and sufficient proof, convicted the defendant of the crime of manslaughter.

The law does not require the public prosecutor to prove wilful mismanagement or malconduct by the accused. The inquiry is not, whether he was guilty of intentional negligence or inattention, but only whether he did what is forbidden by the law, and whether the explosion and destruction of life charged in the indictment arose from either of those causes. To resolve that question, you must have a clear and accurate understanding of the meaning of the terms used by congress in the law.

[2] [From 11 N. Y. Leg. Obs. 161.]

By misconduct, negligence or inattention in the management of steamboats, mentioned in the statute, is undoubtedly meant the omission or commission of any act which may naturally lead to the consequences made criminal; and it is no matter what may be the degree of misconduct, whether it be slight or gross, if the proof satisfies you that the explosion of the boiler was the necessary or most probable result of it.

In order to possess a satisfactory apprehension of the language of the act, it is important to understand what are the duties of the captain of a steamboat—what responsibility he incurs personally—when his duty is merged in the duties of the other officers—and when the responsibilities of the other officers are independent of his. Was it the duty of the master to see to the state of the boiler, or that proper precautions were taken to relieve it from the pressure of steam when the boat was running or had stopped; or did that duty belong exclusively to the engineer? The practice and opinions of experienced officers and engineers on the subject have been testified to. It appears that a practice has grown up and become very common, to allot to the different officers separate and independent trusts and commands; and it is a general notion that it belongs to the pilot to navigate the vessel, independently of the captain, and that the engineer is, in his special department, not subordinate to the captain in the performance of his duties. If that were the true construction of the law, the captain would stand discharged of responsibility for all acts of the engineer appertaining to his particular department. There is no foundation in law for such distinction and restriction in the duties of officers of steamboats. They are the same in law as those of the officers of other vessels. The master is commander-in-chief. The law entrusts him with the control of the vessel and of every department of service on board; and the engineer has no more right to refuse obedience to his orders than has the mate. The captain is charged with responsibility for the right performance of all duties which appertain to the command and management of the propelling power of the vessel. If there be misconduct or neglect in the engineer's department, the captain is, by the maritime law, responsible civilly, and, by this statute, criminally for the consequences. But, if he procures competent persons, and gives them injunctions to perform the duties, the law will not impute guilt to him, if they, without his knowledge, neglect the duties assigned to them.

Although the captain may not select or engage the engineer, and the owners, as they have a right to do, employ him and fix the amount of his compensation, yet that circumstance in no way withdraws from the captain the rightful control over him, in every particular of his service on board, unless his authority is expressly made inde-

pendent of the captain. This must manifestly be so, or there could be no unity of command or action in working the vessel. The notion expressed by some of the witnesses, that an engineer holds his place independently of the authority of the master, and that the latter has no power to restrain him, even if he is crowding the machinery with a head of steam beyond what the master deems to be safe or prudent, has no foundation in law. The master has supreme command in all respects, in directing the navigation of the boat, including control over the head of steam to be used. He is responsible for every misuse or neglect of that authority, and is, by the law in question, made a wrongdoer, answerable criminally on indictment, if he omits to interpose and suppress the danger. He is bound to see that all persons under his command do their duty properly; and this statute especially compels him, at his personal peril, to be actively awake to the safety of his passengers. It makes no difference in his favor, if the engineer be the more skilled and competent man in respect to the management of steam. The supremacy of authority is with the master, on general principles; and, in respect to specific duties imposed on him by law, he is responsible that proper measures be taken for their performance.

There is no distinction, in law or maritime usage, between the relative duties and responsibilities of different officers who serve on vessels propelled by steam, whether such vessels navigate inland waters exclusively or are sea-going vessels. The pilot cannot, at his discretion, take a course different from that directed by the master. Nor can the engineer raise the steam to or keep it at a gauge beyond what is prescribed by the master, whatever may be the desire or judgment of the pilot or engineer in those respects. It belonging to the master, of right, to dictate to his subordinate officers, it will be presumed that what is done by them, under his observation, is so done by his direction or assent, unless he proves his ignorance or that his directions have been disregarded.

The great question in this case is, whether the omission to raise the safety-valve when the vessel stopped at the dock at Bristol, was an act of misconduct, inattention or negligence in the captain, within the meaning of the twelfth section of the statute? This question arises on the seventh section of the same statute, which I have already read to you. The statute does not charge the engineer with the duty of raising the safety-valve, but it is imperative in respect to the master, and imposes the duty on him to see that the safety-valve is raised when the boat stops. The omission to do so thus becomes, in respect to him, a direct violation of the law, and has an important bearing upon the meaning and application of the twelfth section.

It is not a correct interpretation of the law, to understand it as requiring the safety-valve to be raised only in the contingency that the boiler has acquired, while stopped, a higher pressure of steam than was upon it when the boat was under headway; for that would permit the captain, without regard to danger, to keep the head of steam, during stoppage, the same as it was before coming to the dock. This would be, manifestly, in violation of the whole policy of the enactments, because a boat might thus be running under any head of steam, no matter how extreme and perilous, and yet the steam might be maintained at the same height while at the dock. The law was framed to promote the safety of the vessel and of the property and passengers on board. The whole purpose aimed at would be frustrated, if the boat could be allowed to retain, when stopped, any pressure of steam she could generate whilst in motion. The object of the law was to secure a low state of steam, at all events, when the boat stopped; and, to effect this, the safety-valve is required to be opened, so as to keep the steam down, at all events, to what it was when the vessel was under headway. This presupposes that she is running with no more steam than is safe and prudent in the condition of her boiler. It would be, in itself, an act of misconduct to keep, at any time, a gauge of steam on the boiler beyond its fair capacity to bear; and, in addition to that plain obligation implied in the provisions of the twelfth section, congress superadded, in the seventh section, the express duty of raising the safety-valve on stopping the boat.

The course of the defence would seem to imply that the accused was justified in carrying any amount of steam within the range of fifty pounds to the square inch, which the certificate of the inspectors suggests the boiler would bear. But, the inspectors have no authority, under the act, to dictate what amount of steam, whether forty or fifty pounds, more or less, may be used, or to compel steamboat owners or masters to follow their advice in that respect. It was wise and prudent in them to counsel parties on that subject. But this was only advisory and cautionary. They had no power to compel obedience. Nor was their opinion backed by facts which could give to it any special importance with the engineer or master. They had no authority to test the sufficiency of the boiler by steam or hydraulic pressure, to ascertain whether it could bear fifty pounds or ten pounds pressure to the inch. Moreover, these inspections are only periodical, and are required to be made at six months' intervals. In this instance, the period for re-inspection had nearly come around, and that should have been a further caution to the officers of the Reindeer to be vigilant and prudent, and not to rely upon the opinions of inspectors, given months previously, as to the present safety and sufficiency of the boiler.

The testimony also affords reason to believe that, during the time since the last inspection, the boat had been running in active

competition with others, which would have tended to overstrain and weaken the boiler, and to render less and less liable and trustworthy the opinion of the inspectors upon its former condition and strength. This condition of things is necessarily incident, in a greater or less degree, to all boats in use; and, therefore, it is not to be implied that congress intended to take the height of steam put upon a boiler whilst a boat is running, as the measure of what may be retained when she is stopped. It would be to abrogate the beneficial object of this feature of the law, *so to construe it.* The whole scope of the enactment shows that congress intended that steam vessels should be, at all times, restrained to the use of no more steam than is compatible with entire safety; and the particular provision in question aims to fulfil that general intention, by guarding against an accumulation of steam when the vessel is at rest. Masters and engineers would be responsible, under the common and local law, for putting on an unsafe amount of steam in running boats. And congress, without giving further sanction to that law, by inflicting a fine or punishment, under the United States authority, for its violation, has applied its positive enactments, in this particular, by an absolute injunction that the safety-valve shall be raised whenever the vessel is stopped. It is hoped that the provisions of the new law, which goes into effect in a few days,—Act Aug. 30, 1852 (10 Stat. 61),—will prove more efficacious, both in ascertaining the actual strength of boilers, and in compelling a prudent use of them when the boat is in motion, than has been secured under the existing law; but its regulations have no application to this case.

The special question for the jury to consider and determine is, whether the vessel was under a prudent and safe head of steam at the time she was stopped at the landing; and whether the boiler had a sufficient supply of water; and, next, whether the omission to open the safety-valve at that time was the cause of the explosion.

A ground of defence taken on this branch of the case is, that the safety-valve is required to be raised only as a means for lowering the steam in the boiler, and that the method pointed out in the act need not be adopted, if other and better means are employed for effecting the same end. In this view, it is contended that the accused has clearly proved, from universal practice and the judgment of skilful and experienced men, that, when coal is used for fuel, the steam in the boiler is more speedily and certainly reduced and made safe, by opening the furnace and flue-doors, than by raising the safety-valve. I do not, however, interpret the statute as leaving it optional with the master to adopt the course prescribed by the statute, or to substitute another. I think the statute is peremptory, and that the master has no right to deviate from its particular requirement. The plain language of the act must govern, and the master is bound to obey it. Congress has the like power to dictate in this particular as in that of the enrolment or inspection of steam vessels before they are allowed to run, and, in either case, to subject owners and masters to penalties for disobeying the prohibition.

The propriety of this enactment, or its fitness to secure the end proposed, or its inutility or inferiority to other methods, could not be determined with certainty by the opinions or theories of experts, if it were left an open question. This has been clearly evinced by the evidence on this trial. The statute is designed to obviate all obscurity or speculations on this point, and to supply a plain and determinate rule of action for the avoidance of a special hazard and peril, and, what is equally important, to ensure implicit obedience to its regulations. Engineers, like other professional men, naturally incline to give slight heed to legislative directions which stand in conflict with their own opinions and practices. But it cannot be necessary to say more on this head, than that theories and speculations can have no place here. Congress has the power to give the rule, and we must accept the national will, as expressed in the law, as fixing the method which must be observed and adhered to, without regard to its abstract reasonableness or usefulness. Besides, it is far from being made clear, upon the evidence, that the usage of opening the doors of the furnaces relieves the boiler sufficiently, or that the idea is an erroneous one which induced congress to require the safety-valve to be always opened for the discharge of steam when the boat is stopped. After an experience of twelve or thirteen years, congress appears to adhere to the same opinion; and, in a few days, a law will go into operation compelling steamboats to have, not only one but three safety-valves ready for use, one of which must be self-acting and out of the control of the captain or engineer, so that it shall open at a particular point of steam, no matter what other means are in use to keep the steam below that point. Nor do I think that the engineers express themselves decidedly of opinion that opening the doors of the furnaces and flues can always be relied upon as sufficient, nor but that, under many circumstances, it will be necessary to open the safety-valve also, especially if there be a deficiency of water in the boiler.

It seems to the court plain, that the object congress had in view, in the provision, was to compel the master to have the safety-valve opened when the boat stops, without regard to other measures which may be employed to prevent an explosion. If experience has demonstrated the law to be useless or improvident, and that additional danger is incurred by raising the safety-valve, the legislature should have been appealed to for a repeal or modification of the law, so that masters need not be compelled to use means calculated to increase danger instead of warding it off.

The legislative will must govern; and that declared by this law must be obeyed until a different one is substituted by congress. But, if we may judge by the late enactment on the subject, there has been no change of legislative opinion. It is no matter what may be the inconvenience or expense to the owners, or what delay it may cause in the progress of the boat. It is your duty, equally with that of the court, to hold captains of steamboats to a strict obedience to the direction of the legislature, and to regard an intentional deviation from it as a fault. Whether such neglect or misconduct be of a criminal character, will be more particularly considered hereafter.

The excuse set up for the master, in this instance, that he was occupied with other duties of his command, cannot avail as a defence, because it was in no way necessary that he should be personally at the engine and raise the valve with his own hand. He would stand acquitted of blame if he had laid express commands on the engineer and his assistants to see that it was done at every stoppage. He is not permitted to leave this duty to the judgment and discretion of the engineer, even if satisfied the latter has more skill and experience than himself.

The crime created by the statute does not rest upon any wrong intention of the officer who is subjected to indictment. As regards the defendant in this case, he is not accused of any wilful misconduct, or of any design to injure the vessel or any person on board or to put either in danger. The indictment is not placed upon that ground. You will examine the evidence, and see whether you can fairly imply from it that the captain had given proper orders for the safety-valve to be raised when the boat was stopped; and, if not, you must regard his omission to take that precaution as legal evidence of misconduct, negligence and inattention, tending to support the indictment. In order to convict him, the district attorney must prove some act of negligence or omission. It must be shown that the accused omitted to do something which it was incumbent upon him to do in fulfilment of his duty, or that he did something in violation of his duty. The mere circumstance of the valve's not having been raised, is not to be taken by itself as full proof of the crime charged against the captain. The essential question is, not whether the evidence shows that the captain was negligent of his duty, but whether the explosion was caused by the particular negligence proved; that is, whether the proof satisfies your judgment that the omission to raise the valve was the proximate cause of the explosion and of the death of the persons destroyed. And, in examining this point, it is important to ascertain what was the actual state of the boiler. If it was insufficient, from some inherent defect, at the time it was inspected, or had afterwards become so from ordinary use, and there was nothing

discernible, by reasonable attention and diligence, to indicate any defect, and if, furthermore, it appears that such occult defect was the cause of the explosion, then the defendant cannot be made responsible criminally for consequences arising out of that condition of things. It is necessary that this branch of the case be carefully considered, and, if it appears upon the evidence that this boiler must, most probably, have exploded under a cautious use of steam. and that it was intrinsically unsafe under such circumstances, the omission to raise the valve on stopping the boat should not be regarded as adequate evidence that such omission caused the explosion, and the accused ought to be acquitted of the crime charged upon him by the indictment.

It is incumbent upon the jury to weigh considerately the proofs bearing upon this point, and to be satisfied there was no more than a reasonable head of steam upon the boiler at the time of the explosion; because, latent defects in that will afford the master no protection, if he allowed an improvident and unsafe pressure of steam to be then generated. The accused is called on to answer for his negligence or misconduct in allowing the boiler to be under a dangerous gauge and pressure of steam, but not for an explosion arising from other causes. The only direct proof of any act of misconduct, negligence or inattention by the defendant, is his omission to have the safety-valve raised at the time it was, by statute. made his duty to raise it; but, you must connect with that and consider all other circumstances in evidence attendant upon the catastrophe or directly preceding it, and judge from the whole evidence whether that omission was the productive cause of the explosion and homicide charged upon him. If, on consideration of all the facts and circumstances laid before you by the testimony, you are unable to determine, to the clear satisfaction of your judgment, what was the immediate cause of this disaster, and of the appalling destruction of life which attended it. or if, on such review, it remains doubtful in your minds whether the explosion was occasioned by any culpable inattention, or negligence or misconduct of the defendant, then he is entitled to your acquittal.

[In submitting this case to your judgment, the court, gentlemen of the jury, reposes the most entire confidence in your intelligence, discretion, and sagacity, and is persuaded that the issue, so deeply affecting the defendant and the public, will be determined by you according to the law and the facts.][2]

The jury, after retiring, came into court, and requested a further explanation of the seventh and twelfth sections of the act.

Judge BETTS read the two sections to the jury, and remarked that, the command of the seventh section being positive, that the mas-

---

[2] [From 11 N. Y. Leg. Obs. 161.]

ter shall open the safety-valve on the stoppage of the boat. it is a culpable omission in him to leave it to the option of the engineer to open the valve or not, at his discretion. It is the duty of the master to give explicit orders that the statutory direction in this respect be strictly obeyed. The true construction of the law does not authorize the master to keep the safety-valve down while the boat is stopped, although the steam is no higher during the stoppage than when the boat was under headway, provided the pressure before she stopped was an unsafe one. The law does not authorize the master to keep on a head of steam when the boat is stopped, which was dangerous when she was under headway

The twelfth section does not declare that the particular act of misconduct or neglect, in keeping down the safety-valve when the boat is stopped, is a criminal offence; but it becomes so, under that section, if the omission to open the valve at that time causes the explosion of the boiler. If the jury are satisfied, upon all the evidence, that an improper and unsafe pressure of steam was kept on the boiler, and that it exploded from that cause, and of the further fact, that, if the safety-valve had been opened when the boat was stopped, the danger would have been avoided, then, as before remarked, the master's disobedience of the seventh section in that respect would be legal evidence against him under the twelfth section. That disobedience is not declared to be of itself a crime; but yet, if it causes the death of a person on the boat, it is competent evidence in proof of the misconduct or negligence which is made criminal by the twelfth section. [Whether it had that effect or not, is wholly matter of fact for the jury to decide.]2

[The jury then returned to their room and, after an absence of one hour, returned into court, stating their inability to agree on a verdict. By consent of counsel, on both sides, the jury were discharged without rendering a verdict.]2