[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-15084

————————————————

D.C. Docket No. 1:18-cr-20314-CMA-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MAURICIO ALVAREZ,

Defendant - Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(April 7, 2020)

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Mauricio Alvarez appeals his conviction for violation of the Seaman's

Manslaughter Statute, 18 U.S.C. § 1115, on the premise that it unconstitutionally

criminalizes simple negligence.  He also appeals his 33-month sentence.  He asserts the district court erred in applying the base offense level for "reckless operation of a means of transportation" under U.S.S.G. § 2A1.4(a)(2)(B) without an expert witness to opine on the duty of care.  In further support of his sentence appeal, Alvarez argues the court erred in not considering the requirement under 18 U.S.C. § 3553(a)(6) to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  After careful consideration, we affirm.

## I.

### A.

Alvarez's conviction arises from a tragic accident that occurred on April 1, 2018, while he was the captain of the *Miami Vice*, a Florida-registered 91-foot performance yacht.  Alvarez was hired by the yacht's owner to serve as a captain onboard the *Miami Vice*, which was offered for commercial charters for hire.

The United States Coast Guard imposes regulations on the charter-boat industry to protect the safety of individuals engaged in commercial charters and their passengers.  For a commercial charter for hire to be lawful, the captain of the charter must have taken a USCG-approved captain's license course and must have an active USCG captain's license.  USCG-licensed captains are taught essential safety information, including the necessity of conducting a pre-voyage safety briefing with passengers;  prudent seamanship, such as safe methods of navigation and mooring

2

or anchoring a vessel in varying conditions;  and the critical steps that must be taken before starting the vessel's engines, like conducting a head-count of all passengers and establishing a 360-degree lookout to observe dangers in the water.

Alvarez never took the captain course, and he has never held a USCG license. Despite having no formal training in operating such a large vessel, Alvarez served as charter captain on the *Miami Vice* at least forty times between October 2017 and the date of the accident.

But before we get to the terrible incident on April 1, we pause to discuss three events leading up to that fateful day.  First, in October 2017, a National Park Service ranger encountered Alvarez in the waters outside Biscayne National Park.  Alvarez was on a jet ski, which was illegal to operate inside the park.  Because Alvarez was wearing a shirt that had the word "charter" on it, the ranger asked him about his shirt; in response Alvarez explained that he was a captain for a chartered vessel that was about 45 to 50 yards away.  The ranger followed Alvarez back to the yacht and requested his commercial-use authorization for the National Park Service, his contract for the chartered vessel, and his USCG captain's license.  Having none of them, Alvarez responded that he did not know what a commercial-use authorization was and that the contract for the vessel and his captain's license were left behind— a false statement, since Alvarez did not in fact possess a USCG license.  The ranger cited Alvarez for operating a personal watercraft and conducting a commercial

3

business within the National Park without a permit.

The second event of importance predating the accident occurred on March 18, 2018. That day, Alvarez was acting as a paid captain on board the *Miami Vice* in the vicinity of the Sea Isle Marina, on Biscayne Bay, in Miami-Dade County, Florida. Alvarez was again issued a citation for operating a commercial charter without an appropriate USCG captain's license, in violation of USCG regulations.

Finally, less than a week after the second event, on March 24, 2018, a USCG Marine Inspector met with Alvarez at the Sea Isle Marina. The inspector explained to Alvarez the USCG regulations governing the operation of commercial charters. He further told Alvarez that the manner in which the *Miami Vice* was being chartered was illegal because, among other reasons, Alvarez did not have a valid USCG captain's license.

With that background, we return to April 1, 2018. Non-party C.M. and victim R.M.P. arranged to charter the *Miami Vice* to celebrate C.M's birthday. Upon arriving at the Sea Isle Marina where the *Miami Vice* was docked, C.M. and R.M.P. paid for the charter. They met Alvarez, who identified himself as the captain of the *Miami Vice*, and Alvarez's son, who was acting as the first mate for their charter. TM Yachting Charter LLC—the owner of *Miami Vice*—provided Alvarez and his son to crew the charter. Four friends of C.M. and R.M.P. also joined them at the Sea Isle Marina, and the *Miami Vice* departed with Alvarez as its captain.

After departing, Alvarez navigated the *Miami Vice* to Monument Island, in Biscayne Bay, in Miami-Dade County.  Upon arriving at Monument Island, Alvarez did not anchor.  Instead, he beached the *Miami Vice*—again, a 91-foot yacht—on Monument Island.  The area around the island was crowded and full of other boaters.

After Alvarez beached the *Miami Vice*, C.M. and R.M.P. jumped into the bay and began swimming in the water behind the yacht.  At some point, Alvarez also got into the water behind the *Miami Vice* and swam.  C.M. and R.M.P. climbed out of the water back onto the rear swim platform of the yacht, where they had a conversation with Alvarez.  Alvarez then raised the dive ladder and went to the helm in preparation to leave the island.  C.M. and R.M.P. were not aware that Alvarez was preparing to start the engines and leave the island, so they jumped back into the water.

From the helm of the *Miami Vice*, it is impossible to see the rear swim platform of the vessel and the water immediately behind the vessel.  Nevertheless, Alvarez did not return to the rear of the *Miami Vice* to ensure that everyone was onboard before he started the engines.  Nor did he ask his first mate to go to the stern of the boat to ensure that the passengers were not on the rear swim platform or in the water behind the yacht during reversal.

Instead, Alvarez simply started the engines of the *Miami Vice* and immediately placed them into reverse to back off the island.  C.M. and R.M.P. were

5

still in the water swimming behind the yacht. When the engines started up, R.M.P. was pulled underneath the yacht as it reversed, leaving a cloud of blood in the water. C.M. and the passengers still onboard the yacht yelled to Alvarez to turn off the engines, which he did. He then jumped into the water to look for R.M.P., but those attempts proved unsuccessful, as R.M.P. had been caught by the propellers and was killed.

After the incident, law enforcement spoke with all of the individuals who were present on the boat, including the five surviving passengers. Four of the passengers stated that, before Alvarez started the engines and placed the boat in reverse, they never heard Alvarez tell anyone the yacht would be leaving immediately and did not see him check the rear of the yacht to determine whether anybody was swimming behind the boat. A fifth passenger said he saw Alvarez standing on the rear of the yacht talking to C.M. and R.M.P. as they were swimming in the water, and he heard Alvarez state that the yacht would be moving from the island. But the same passenger recalled that Alvarez pulled up the boarding ladder while C.M. and R.M.P. were still swimming. C.M. acknowledged that he and Alvarez had a conversation about going to pick up other people, but C.M. said Alvarez did not indicate that he intended to leave imminently, nor did he tell C.M. and R.M.P. not to get back in the water.

In sum, all of the survivors onboard confirmed that Alvarez did not loudly

6

announce that the boat was departing; did not perform any head count to ensure that all of the passengers were on the boat before he started the engines; did not check behind the yacht before he engaged the engines in reverse; and did not establish anyone as a lookout in the rear of the vessel before he reversed the yacht. Alvarez concedes that these are all basic steps that a reasonable person at the helm of the *Miami Vice* would have taken to ensure the safety of passengers and others in the water prior to reversing the yacht.

After the incident, a USCG inspector responded to Monument Island along with other law enforcement. There, the inspector wrote Alvarez yet another citation for operating a paid charter without a USCG captain's license. Law enforcement requested that Alvarez submit a urine sample, so they could determine whether he was under the influence of any alcohol or other drugs, but Alvarez refused. The next day, Alvarez submitted a urine sample for analysis, which tested positive for the presence of cocaine. Video later extracted from Alvarez's cell phone depicted him snorting cocaine on March 29, 2018, just three days before the incident.

After April 1, R.M.P.'s remains were recovered by scuba divers in the area of Monument Island. The Miami Dade Medical Examiner concluded that R.M.P. died as a result of injuries inflicted by the yacht propeller.

**B.**

A federal grand jury returned a one-count indictment against Alvarez. It

charged that, as the captain of the *Miami Vice*, Alvarez caused the death of R.M.P. through his "misconduct, negligence, and inattention to his duties on said vessel," in violation of 18 U.S.C. § 1115. Alvarez moved to dismiss the indictment, arguing in part that the statute unconstitutionally criminalized simple negligence, was vague and overbroad, and violated a defendant's right to remain silent by burden-shifting. The district court denied the motion.

Alvarez thereafter entered a guilty plea but reserved his right to appeal the denial of the motion to dismiss the indictment. At sentencing, he objected to the PSI's base offense level of 22 under the involuntary-manslaughter guideline in U.S.S.G. § 2A1.4(a)(2)(B) pertaining to the reckless operation of a means of transportation. Alvarez argued that his conduct was merely negligent, which would result in a base offense level of 12 under U.S.S.G. § 2A1.4(a)(1) and a sentencing range under the Guidelines of 8 to 12 months of imprisonment. Meanwhile, the government filed a motion for an upward variance. The district court denied the government's request for an upward variance and denied Alvarez's objections to the recklessness enhancement. The court found that Alvarez's conduct qualified as reckless. It explained,

> Alvarez, as a seasoned and experienced boat captain, lacking the proper licensure nonetheless, consciously realized when he backed up that 90-foot yacht without the ability to see behind him, without checking to make sure there was no one—not just this poor victim, but no one in the vicinity of the risk he was creating by backing up that boat, that yacht. And I do find there existed that subjective awareness. He wasn't

8

a novice operating that boat.  He had so many hours logged as captain of boats.

After considering the § 3553(a) factors, the court then sentenced Alvarez to 33 months of incarceration—the low end of the guidelines range of 33 to 41 months of imprisonment.

This appeal followed.

## II.

We review *de novo* preserved constitutional challenges to a criminal statute. *United States v. Ferreira*, 275 F.3d 1020, 1024 (11th Cir. 2001).

The Seaman's Manslaughter Statute provides that any captain "by whose misconduct, negligence, or inattention to his duties on [a] vessel the life of any person is destroyed" shall be fined, imprisoned, or both.  18 U.S.C. § 1115.  The plain language of the statute thus criminalizes simple negligence.

Alvarez contends that requiring only this *mens rea* violates the Constitution.[1]

---

[1] Alvarez also argues that § 1115 is void for vagueness and overbroad and that § 1115 violates his presumption of innocence and his right to remain silent.  Neither argument has merit. First, Alvarez has presented no legal support or argument for his contention that § 1115 violates his presumption of innocence and his right to remain silent.  The issue is thus waived.  *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).  Nor would we have any basis to hold that § 1115 alters the government's burden to prove a defendant's negligence beyond a reasonable doubt or disturbs a defendant's presumption of innocence or right not to be compelled to testify.  *See United States v. Mozie*, 752 F.3d 1271, 1281–82 (11th Cir. 2014).  As for his vagueness and overbreadth argument, a statute is void for vagueness if it fails to provide "ordinary people" with "fair notice of the conduct [it] proscribes" or has such unclear standards that it will result in "arbitrary or discriminatory law enforcement." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (internal quotation marks omitted).  "'[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal

9

But the Supreme Court has long recognized Congress's power to criminalize mere negligence or to impose even criminal strict liability.

The Seaman's Manslaughter Statute has been in existence in one form or another since the early nineteenth century. *See, e.g.*, *United States v. Warner*, 28 F. Cas. 404, 407 (C.C.D. Ohio 1848); *United States v. Farnham*, 25 F. Cas. 1042, 1044 (C.C.S.D.N.Y. 1853); *United States v. Collyer*, 25 F. Cas. 554, 578 (C.C.S.D.N.Y.1855); *United States v. Keller*, 19 F. 633, 638 (C.C.D.W. Va. 1884); *see also Van Schaick v. United States*, 159 F. 847, 850 (2d Cir. 1908). Despite its longevity, relatively few court opinions exist regarding the statute.

Only one federal appellate court has squarely addressed the *mens rea* requirement under § 1115—i.e., whether the statute requires simple negligence or some heightened standard.[2] In *United States v. O'Keefe*, the Fifth Circuit held that

---

offenses fall within their language,' and there is a strong presumption supporting the constitutionality of legislation." *United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)). Section 1115 is not so ambiguous that a person of ordinary intelligence would have difficulty reading the statute and understanding what activity it prohibits. *See United States v. Fei*, 225 F.3d 167, 171 (2d Cir. 2000) (affirming conviction under 18 U.S.C. § 1115). The statute's "language alone sets forth plainly perceived boundaries" that "are readily understandable to a person of ordinary intelligence." *Duran*, 596 F.3d at 1291. As applied to Alvarez's conduct, it is plain that "misconduct, negligence, or inattention to his duties," 18 U.S.C. § 1115, encompasses operating a 91-foot yacht without a federally required charter license and reversing without ensuring that all passengers are onboard and no one in the crowded area is in the water behind the boat. Alvarez has identified nothing about a negligence standard—a foundational building block of both criminal and civil law—that is impossible to understand or fails to afford fair notice to boat operators such as Alvarez.

[2] Alvarez argues that this Court previously ruled on the issue in *United States v. Thurston*, an interlocutory appeal. 362 F.3d 1319 (11th Cir. 2004). He is mistaken. In *Thurston*, the district court had held that § 1115 required gross negligence. *Id.* at 1321–22. The government did not

10

§ 1115's "terms are unambiguous and therefore must be given their plain meaning." 426 F.3d 274, 279 (5th Cir. 2005). "[N]othing in the statute's terms suggest[s] that the words 'misconduct, negligence or inattention,' were ever meant to imply gross negligence." *Id.* And relying on cases we have mentioned above, the court concluded that "Congress did not intend a requirement of [any] heightened *mens rea*" beyond negligence. *Id.* at 278. The Fifth Circuit again more recently reiterated that "Section 1115 only requires the proof of any degree of negligence to meet the culpability threshold." *United States v. Kaluza*, 780 F.3d 647, 657 (5th Cir. 2015).

Alvarez argues that the Constitution requires a heightened *mens rea* beyond negligence to criminalize conduct. Supreme Court precedent going back nearly a century shows otherwise.

We begin our analysis with the "strong presumption of validity" accorded to an act of Congress." *United States v. Lebowitz*, 676 F.3d 1000, 1012 (11th Cir. 2012). From there, things only get worse for Alvarez's position.

In *United States v. Balint*, the Supreme Court addressed the constitutionality of a criminal provision that lacked a knowledge element. 258 U.S. 250 (1922). The

---

appeal that ruling. Instead, the government re-indicted the defendant under that heightened standard, and the only issue on appeal was whether the second indictment resulted in a violation of the Double Jeopardy Clause. *See id.* In fact, the government explicitly cabined the appeal to that issue, highlighting that the "gross negligence" standard was not before the Court. *See* Brief for the United States, *Thurston*, 362 F.3d 1319 (No. 03-12029), 2003 WL 24337708, at *21 (11th Cir. July 23, 2003). The Court did not opine on the *mens rea* required under § 1115, as it was not an issue before the Court, and the holding in *Thurston* does not require anything of § 1115 other than what its plain language says—negligence.

11

Court explained that, "[w]hile the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime," Congress may pass certain statutes whose purpose eliminates that element. *Id.* at 251–52. Indeed, the Court noted, scienter was not a requirement but rather "a question of legislative intent to be construed by the court." *Id.* at 252. The Court reasoned that "where one deals with others and his mere negligence may be dangerous to them, as in selling diseased food or poison, the policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant of the noxious character of what he sells." *Id.* at 252–53. Thus the question for the courts "is one of the construction of the statute and of inference of the intent of Congress." *Id.* at 253; *see also Bond v. United States*, 572 U.S. 844, 857 (2014) ("For example, we presume that a criminal statute derived from the common law carries with it the requirement of a culpable mental state—even if no such limitation appears in the text—unless it is clear that the Legislature intended to impose strict liability.")

The Supreme Court has confirmed these earlier holdings. In *Morissette v. United States*, the Court observed that a growing number of crimes "depend on no mental element but consist only of forbidden acts or omissions," a category necessitated in part by technological advances including more powerful but dangerous means of transportation. 342 U.S. 246, 252–54 (1952). By the time of *Morissette*, it was commonplace to punish acts "in the nature of neglect where the

law requires care, or inaction where it imposes a duty." *Id.* at 255; *see id.* at 251 n.8 ("Most extensive inroads upon the requirement of intention, however, are offenses of negligence, such as involuntary manslaughter or criminal negligence and the whole range of crimes arising from omission of duty."); *see also Lambert v. California*, 355 U.S. 225, 228 (1957) ("We do not go with Blackstone in saying that 'a vicious will' is necessary to constitute a crime . . . . There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition.").

Thus, the Supreme Court has rejected Alvarez's position that due process requires scienter in every criminal statute. Rather, if Congress intends and expressly crafts a statute to reach negligent actions, then the Due Process Clause does not bar it from doing so. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 71–72 (1994) (noting that courts "presume a scienter requirement *in the absence of express contrary intent*" (emphasis added)). That "contrary intent" is present here in § 1115.

In 18 U.S.C. § 1115, Congress affirmatively, unambiguously, and expressly criminalized the act of negligently causing a person's death while operating a vessel. The "preeminent canon of statutory instruction" provides that Congress "says in a statute what it means and means in a statute what it says." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotation marks omitted). The "starting point must be the language employed by Congress," which this Court

13

interprets according to "the ordinary meaning of the words used." *United States v. Fisher*, 289 F.3d 1329, 1338 (11th Cir. 2002) (internal quotation marks omitted). *See also Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) (courts interpret the words of a criminal statute according to their "ordinary English usage"). Under *Balint* and the other cases discussed above, this decision to impose a negligence *mens rea* fell within Congress's constitutional authority.[3]

## III.

We now turn to Alvarez's sentencing challenges. We accept the district court's factual findings at sentencing, unless they are clearly erroneous, and we review *de novo* the application of the Sentencing Guidelines to the facts. *United States v. Caraballo*, 595 F.3d 1214, 1230 (11th Cir. 2010).

We review a district court's factual finding of recklessness for clear error. *See id.*; *see also United States v. O'Brien*, 238 F.3d 822, 825 (7th Cir. 2001) ("A sentencing court's determination that a defendant's actions were reckless [under

---

[3] Alvarez's reliance on certain statutory-interpretation cases, such as *Elonis v. United States*, 135 S. Ct. 2001 (2015), is misguided. There, the Court inferred congressional intent to include scienter in a silent statute. *Id.* at 2010 ("When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." (internal quotation marks omitted)). When Congress is "silent," it may be appropriate to infer such an element from the recognition that Congress legislates "in light of the background rules of the common law." *Staples v. United States*, 511 U.S. 600, 605 (1994). But that presumption yields when "it is clear that the Legislature intended to impose" a different threshold for liability. *Bond*, 572 U.S. at 857. Here, as we have explained, Congress spoke plainly and expressly when it included "negligence" in 18 U.S.C. § 1115. So the court has no basis to read in a default *mens rea* from the common law here.

U.S.S.G. §2A1.4] is a finding of fact which we review for clear error."). "For a factual finding to be 'clearly erroneous,' this court, after reviewing all of the evidence, must be left with a definite and firm conviction that a mistake has been committed." *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004) (citation and internal quotation marks omitted).

When reviewing the reasonableness of a sentence, we conduct a two-step inquiry, first ensuring that no significant procedural error occurred, and then examining whether the sentence was substantively reasonable. *United States v. Sarras*, 575 F.3d 1191, 1219 (11th Cir. 2009). The party challenging a sentence bears the burden of showing that it is unreasonable in light of the record, the factors listed in 18 U.S.C. § 3553(a), and the substantial deference afforded sentencing courts. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015). The Court reviews the substantive reasonableness of a sentence "under a deferential abuse of discretion standard." *United States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012).

We evaluate substantive reasonableness by considering the totality of the circumstances and whether the sentence achieves the sentencing purposes stated in § 3553(a). *Gall v. United States*, 552 U.S. 38, 51 (2007). The district court must impose a sentence that is sufficient, but not greater than necessary, to comply with the factors and purposes listed in § 3553(a)(2), including the need to reflect the

15

seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. 18 U.S.C. § 3553(a)(2); *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016). The district court must also consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).

The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007). The district court is not required to discuss each of the § 3553(a) factors, and an acknowledgment that it has considered the § 3553(a) factors will suffice. *United States v. Turner*, 474 F.3d 1265, 1281 (11th Cir. 2007). But a district court abuses its discretion if it (1) fails to consider relevant factors that were due significant weight, (2) gives an improper or irrelevant factor significant weight, or (3) commits a clear error of judgment by balancing the proper factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). The district court may base its findings of fact on, among other things, undisputed statements in the PSI or evidence presented at the sentencing hearing. *United States v. Smith*, 480 F.3d 1277, 1281 (11th Cir. 2007).

We will vacate a sentence only if we are left with the "definite and firm" conviction that the district court committed a clear error of judgment in weighing

16

the § 3553(a) factors by arriving at a sentence that is outside the range of reasonable sentences dictated by the facts of the case. *Irey*, 612 F.3d at 1190. A sentence imposed well below the statutory maximum penalty is an indicator of a reasonable sentence. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

## A.

As we have noted, Alvarez was sentenced to 33 months' imprisonment after the district court determined a Guidelines range of 33 to 41 months applied. We review as relevant how the court arrived at this calculation.

The Guidelines provide for a base offense level of 22 for an involuntary-manslaughter conviction that results from the "reckless operation of a means of transportation." U.S.S.G. § 2A1.4(a)(2)(B). Since the government did not call an expert to testify on the duty of care of a yacht captain in Alvarez's position, Alvarez argues that, at most, the district court could find his conduct to be merely negligent, which would result in a base offense level of 12 and a much shorter Guidelines range. *See id.* § 2A1.4(a)(1). We disagree.

The commentary of U.S.S.G. § 2A1.4 explains that recklessness differs from negligence in that recklessness incorporates the defendant's "aware[ness] of the risk created by his conduct." *See* U.S.S.G. § 2A1.4 cmt. 1. Recklessness does not require a more extreme derogation of the defendant's duty of care; both negligence and recklessness, under this section, constitute "a gross deviation from the standard of

17

care." *Id.* This is consistent both with the Model Penal Code and leading treatises on criminal law. *See, e.g.*, Model Penal Code § 2.02(2)(c) (defining recklessness as a conscious disregard of a substantial and unjustifiable risk); Wayne R. LaFave, 1 Substantive Criminal Law § 5.4 (3d ed. 2019) (defining recklessness as the subjective awareness of a higher risk of harm than negligence). Thus, the critical factual issue required the district court to determine whether Alvarez was aware of the risk or risks created by his conduct.

The district court found that Alvarez was aware of this harm. It did not clearly err when it found that Alvarez "consciously realized when he backed up that 90-foot yacht without the ability to see behind him" that he was taking a risk because he could not ascertain that "there was no one—not just the poor victim, but no one in the vicinity" of the boat's engines. Indeed, the Commentary to the Guidelines explains that "'reckless' includes all, or nearly all, convictions for involuntary manslaughter under 18 U.S.C. § 1112." U.S.S.G. § 2A1.4 cmt. 1.

Here, as the district court explained, Alvarez was aware that some of his passengers were swimming alongside or behind the boat while it was beached on the island, and even Alvarez himself got in the water and swam. Plus, seven to eight other boats, each with their own passengers, were anchored or beached within close proximity of the *Miami Vice*, along with other swimmers nearby. Yet C.M. testified that he and Alvarez "never [spoke] about we are leaving now or we are leaving any

18

moment from now." And he testified that Alvarez never told C.M. or the victim to "not go back in the water because [the boat was] leaving," so neither of them had "any idea that the boat was intending to leave imminently." Despite knowing that his own passengers and other swimmers might be in the water, Alvarez did not conduct a head count, announce his departure, or post his first mate as a lookout on the stern of the ship to ensure it had a clear exit path, which is especially troubling given that Alvarez had no visibility behind the ship due to its size and the position of the helm.

And other surrounding circumstances corroborated that Alvarez grossly deviated from the standard of care when he performed this blind maneuver despite these appreciable risks. Alvarez captained this illegal charter, even though, by his own admission, he had "no formal training," the *Miami Vice* was the largest vessel that he ever piloted, and he had had multiple encounters with law enforcement where he was advised that he needed a USCG license to operate such charters, including citations even in the weeks just prior to the incident.

Alvarez also beached the *Miami Vice* on the island rather than anchoring it, a dangerous and unsafe decision that no reasonable captain would make because it necessitated reversing the vessel without being able to see other small boats or swimmers in the vicinity. This was the precise danger, completely disregarded by Alvarez, that caused R.M.P.'s death here. Alvarez admitted after the incident that

he regretted not ensuring that every passenger knew that he was about to leave. He also characterized himself as an experienced captain and a lifelong boatman, which supported the court's inference that his level of experience rendered him attuned to these risks.

Although Alvarez disputed the credibility of some of the testimony on which the district court relied and he presented an alternative account of events, it was the court's role as factfinder to resolve these inconsistencies and make credibility determinations. *See Amadeo v. Zant*, 486 U.S. 214, 227–28 (1988); *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994). The court was entitled to credit the testimony from C.M. and other passengers as well as the investigators. *See United States v. Stanley*, 739 F.3d 633, 653–54 (11th Cir. 2014).

Alvarez also argues that the lack of expert testimony on the appropriate standard of care requires reversal of the judge's finding of recklessness. Again, we disagree. First, Alvarez did not object at any point during the two-day hearing to the lack of expert testimony or contend that it was impossible to resolve the issue without such testimony. So this argument is subject to plain-error review. *See United States v. Cingari*, 952 F.3d 1301 (11th Cir. 2020).

Here, there is no error, plain or otherwise. Factfinders, both juries and courts, often find recklessness without the aid of experts. *See, e.g.*, *United States v. Matchett*, 802 F.3d 1185, 1197–98 (11th Cir. 2015); *United States v. Washington*,

20

434 F.3d 1265, 1267–68 (11th Cir. 2006) (affirming a recklessness finding predicated on defendant's driving at high speed in a garage with substantial foot traffic). The district court here could apply its "common sense and ordinary human experience" to draw inferences from the testimony, *United States v. Philidor*, 717 F.3d 883, 885 (11th Cir. 2013), and to conclude that Alvarez's conduct, which resulted in the victim's death by the *Miami Vice*'s propellers, constituted a gross deviation from the standard of care.

Backing up a yacht from a beach into a crowded swimming area, where the captain cannot see what is behind him, without taking any steps to ensure that no passenger or bystander is behind him and when he has just seen others swimming in the water in a crowded area is reckless in and of itself. No expert is required for the district court to come to that conclusion. Plus, the district court here was aided by the testimony of the other witnesses regarding the beaching of such a vessel, the reversal of such a vessel without using his first mate as a lookout, and the failure to take a headcount before backing up in a crowded area with many swimmers in the water.[4] And when we add to that all the prior warnings that Alvarez received, it was certainly reckless to reverse the *Miami Vice* into a crowded swim area without first

---

[4] As Alvarez stipulated to in his factual proffer, a reasonable captain would not have attempted to approach Monument Island in a yacht the size of the *Miami Vice*, nor would a reasonable captain have beached the yacht on the island because doing so would require the captain to engage in the act of reversing the large yacht off the island in order to leave.

ensuring no one was behind the yacht. If we were to imagine the same circumstances with a car (or a bus, as the district court did) in place of a yacht, there is simply no room to question that conclusion.

All these facts support the district court's finding of an extreme breach of the duty of care. In short, the district court committed no reversible error in finding that Alvarez's actions amounted to recklessness.

**B.**

Finally, Alvarez argues that the district court did not expressly explain why it determined that a Guidelines sentence was appropriate and failed to analyze whether Alvarez's 33-month sentence created an unwarranted disparity with other, similarly situated offenders.

Here, the court gave both parties considerable time over a two-day hearing to make their arguments and expressly noted that it reviewed the cases cited in Alvarez's filings. It also identified the § 3553(a) factors that it considered most important to its determination. The court thus fulfilled its obligation to "listen[] to the evidence and arguments," "was aware of the various factors the defendant put forward for a lesser sentence," and explained its decision under § 3553(a). *Irey*, 612 F.3d at 1194–95. Nothing mandates that the district court "specifically mention the grounds for variance that [Alvarez] argued." *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005), *abrogated on other grounds by Rita v. United States*, 551

U.S. 338 (2007).

There was nothing erroneous in the court's focus on a few factors in announcing its decision because, at sentencing, a judge "is permitted to attach 'great weight' to one factor over others." *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) (quoting *Gall*, 552 U.S. at 57). Indeed, "[t]he decision about how much weight to assign a particular sentencing factor is committed to the sound discretion of the district court." *Rosales-Bruno*, 789 F.3d at 1254 (internal quotation marks omitted).

As for the sentence's substantive reasonableness, our task is to determine whether the district court pronounced "a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (internal quotation marks omitted). While we do not apply a presumption that a sentence within the advisory range is reasonable, we "ordinarily expect a sentence within the Guidelines range to be reasonable." *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (internal quotation marks and alterations omitted). The fact that a sentence rests below the statutory maximum also "favor[s] its reasonableness," *Rosales-Bruno,* 789 F.3d at 1256–57, and Alvarez's 33-month low-end Guidelines sentence was well below the 120-month statutory maximum of 18 U.S.C. § 1115. Faced with the facts outlined above, the district court acted well within its discretion when it concluded that the most pertinent sentencing factors were "the nature and

23

circumstances of the offense, of course, this defendant's history and characteristics, [and] the need to promote respect for the law and provide deterrence."

The decision to sentence Alvarez within the Guidelines range also honored the court's obligation to avoid unwarranted sentencing disparities. *See Irey*, 612 F.3d at 1181. Nor is a Guidelines sentence unprecedented for the offense of manslaughter. *Cf. O'Brien*, 238 F.3d at 824, 828.

Relying on 18 U.S.C. § 3553(a)(6), Alvarez highlights that other defendants convicted under the Seaman's Manslaughter Statute have received lighter sentences. *See* 18 U.S.C. § 3553(a)(6) (requiring the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). In particular, he points to the lighter sentence the owner of the *Miami Vice* received. But Alvarez and the owner did not play the same role in R.M.P.'s death. And we regularly reject arguments regarding a purported disparity between codefendants who played different roles in the offense. *See, e.g.*, *United States v. Bergman*, 852 F.3d 1046, 1071 (11th Cir. 2017); *United States v. Regueiro*, 240 F.3d 1321, 1325–26 (11th Cir. 2001).

The district court properly considered the facts of Alvarez's actions in this case and gave due consideration of the §3553(a) factors in reaching a sentence at the low end of the Guidelines. In doing so, it committed no reversible error.

24

## IV.

For the reasons above, we affirm Alvarez's conviction and sentence.  Oral argument in this case is **CANCELED**.

**AFFIRMED.**